<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JRM CONSTRUCTION MANAGEMENT, LLC, et al. | |
| Plaintiff, | No. 23cv932 (EP) (CLW) |
| v. | **OPINION** |
| CRAIG PLESCIA, et al., | |
| Defendants. | |

**PADIN**, **District Judge.**

This is a trade secret, restrictive covenant, and unfair competition action. Plaintiffs JRM Construction Management New Jersey, LLC ("JRM NJ") and its parent, Co-Plaintiff JRM Construction Management, LLC ("JRM"), allege that former employees Craig Plescia and Brielle Rubinetti misappropriated Plaintiffs' confidential information and trade secrets for the benefit of Plaintiffs' competitor, and Plescia and Rubinetti's new employer, Elysium Construction, Inc. ("Elysium"; together with Plescia and Rubinetti, "Defendants").

Plaintiffs seek a temporary restraining order ("TRO"), preliminary injunction ("PI"), and expedited discovery. D.E. 4. After an initial telephonic hearing on February 21, 2023 and subsequent briefing, it is clear that the central issues in this case—whether Plaintiffs' information was confidential, whether Plescia and/or Rubinetti disclosed that information, and whether Plescia poached Plaintiffs' employees and clients—are disputed and require robust discovery. The Court will therefore **DENY** the motion.

I.  BACKGROUND

Plaintiffs allege that former employees Defendants Brielle Rubinetti and Craig Plescia have misappropriated confidential information and/or trade secrets for the benefit of Elysium, their new employer.  The specific confidential information/trade secrets (the "Confidential Information") can best be summarized as client PowerPoint pitch presentations, project estimator training procedures, and Excel templates used to estimate and prepare final budgets for client project bids.[1] Compl. ¶¶ 261, 279, 297.  Plaintiffs also allege that Plescia poached numerous employees to Elysium, including Rubinetti.

Plaintiffs assert ten counts revolving around a common core of allegations: that: (1) Rubinetti and Plescia were subject to confidentiality agreements governed by New York law, and Plescia was subject to a restrictive covenant precluding solicitation of Plaintiffs' clients and employees; (2) Rubinetti, employed as Plaintiffs' Estimator, went to Elysium's Manhattan office and shared Plaintiffs' confidential information with Elysium; (3) two weeks before Plescia's resignation and on his resignation day, he plugged USB drives into his JRM laptop and copied confidential information, including a personal folder labeled "Craig's departure"; (4) Plescia solicited many of Plaintiffs' employees, four of whom also

---

[1] Plaintiffs further define the Confidential Information as:

> templates, client contracts, customer information, training materials, change orders, client allowance tracker, logs with purchase order detail – by vendor, requests for estimate, budgets, estimates, estimate summaries, broken down floor summaries, variance reports, general condition pricing matrixes for calculating in house cost on a project, detailed estimates that breakdown and show Plaintiffs' unit rates and format for pricing projects client preconstruction proposals, long-form client proposals, leveling related documents, internal bid reviews, scope of work, quotes, and drawings for projects and proposals

Compl. ¶ 64.

left for Elysium; (5) Plescia solicited Plaintiffs' clients and successfully lured away at least one to Elysium.

Plaintiffs' ten counts are:

(1) breach of contract against Plescia and Rubinetti;
(2) breach of fiduciary duty/loyalty against Plescia and Rubinetti;
(3) violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, against all Defendants;
(4) misappropriation under the New Jersey Trade Secrets Act, N.J.S.A. § 56:15-1, *et seq.*, against all Defendants;
(5) violation of the New Jersey Computer-Related Offenses Act, N.J.S.A. § 2A:38A-1, *et seq.*, against all Defendants;
(6) misappropriation of confidential information and trade secrets against all Defendants;
(7) unjust enrichment against all Defendants;
(8) unfair competition against all Defendants;
(9) tortious interference with contract against Plescia and Elysium; and
(10) tortious interference with prospective economic relations against all Defendants.

Based on these counts, Plaintiffs seek a temporary restraining order/preliminary injunction: (1) enjoining further disclosure of confidential information, solicitation of Plaintiffs' clients or employees; (2) compelling Defendants to submit to a forensic analysis to locate and remediate any of Plaintiffs' confidential information; (3) compelling Plescia to identify all locations where he has inserted Plaintiffs' USB drives; and (4) requiring Defendants to return all hard copies of Plaintiffs' confidential information. Plaintiffs also seek expedited discovery.[2]

## II.   LEGAL STANDARDS

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). The primary purpose of preliminary injunctive relief is

---

[2] The Complaint also seeks damages, but this Opinion addresses only the requests for injunctive relief and expedited discovery.

3

"maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994). To obtain a temporary restraining order or preliminary injunction, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. Cty. of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)).

The movant bears the burden of establishing "the threshold for the first two 'most critical' factors… . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179. A court may issue an injunction to a plaintiff "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 (3d Cir. 1994); *see also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) ("The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate."); *Ferring*, 765 F.3d at 210.

Importantly, a preliminary injunction should not be issued where material issues of fact are in dispute. *Vita-Pure, Inc. v. Bhatia*, 2015 U.S. Dist. LEXIS 42655 at *3 (D.N.J. Apr. 1, 2015) (denying injunction where factual disputes "preclude a determination that Plaintiffs have established a likelihood of success on the merits"); *Collick v. Weeks Marine, Inc.*, 397 Fed. App'x 762, 764 (3d Cir. 2010) (preliminary injunction is inappropriate where there is an "abundance of contradictory facts on both sides of the record"); *Watchung Spring Water Co. v. Nestle Waters N.*

4

*Am. Inc.*, 2014 U.S. Dist. LEXIS 151178, at *2 (D.N.J. Oct. 23, 2014), *aff'd*, 588 F. App'x 197 (3d Cir. 2014).

## III.  ANALYSIS

### A.  Likelihood of success on the merits

To satisfy the first prong of the preliminary injunction inquiry, a plaintiff must demonstrate a likelihood of success on the merits of the action.  *Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012).  At the preliminary injunction stage, a plaintiff need only show a reasonable chance of winning or, in other words, a chance that is "significantly better than negligible but not necessarily more likely than not."  *Reilly*, 858 F.3d at 179.

According to Plaintiffs, only Plescia signed a Non-Competition & Non-Solicitation Agreement ("Restrictive Covenant Agreement") on December 10, 2020, required as part of JRM NJ's Profit Sharing Bonus Agreement.  Compl., Ex. C.  Plescia *and* Rubinetti signed JRM's Confidentiality Agreements (with the Restrictive Covenant Agreement, "Agreements") on January 6, 2020.  *Id.* at Exs. A-B.

As noted above, Plaintiffs allege that Defendants violated the Agreements in several ways: (1) Plescia disclosed client information to Elysium for Elysium's benefit, D.E. 4 at 6-7; (2) Plescia retained at least three USB devices "and saved massive amounts of Plaintiffs' Confidential Information, in order to use [it] at Elysium," *Id.* at 7; (3) Plescia breached his non-solicitation obligations by soliciting seven JRM NJ employees to work for Elysium, four of whom did so, *id.*; (4) Plescia poached at least one JRM NJ client, *id.*; and (4) Rubinetti went to Elysium's headquarters with her JRM computer and shared Plaintiffs' Confidential Information there, *id.*

Relying on these alleged violations, Plaintiffs argue that they will ultimately succeed on the merits of their claims because Plescia and Rubinetti misappropriated Plaintiffs' Confidential

information for their own (and Elysium's) benefit, Plescia and Rubinetti's actions have already resulted in lost clients and employees, and each passing moment exacerbates Plaintiffs' harm. But Plaintiffs encounter a roadblock even at the first inquiry: whether the allegedly misappropriated information was confidential.

### 1. *The first issue of fact: whether measures were taken to protect the Confidential Information*

The Defend Trade Secrets Act and New Jersey Trade Secrets Act, analyzed together, permit a misappropriated trade secret's owner to bring a civil action and seek injunctive relief. *See Par Pharm., Inc. v. QuVa Pharma, Inc.*, 2018 U.S. Dist. LEXIS 43612, at *18 (D.N.J. Mar. 16, 2018).[3] A trade secrets plaintiff will succeed by showing (1) that it possessed a trade secret, and (2) that the Defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. *See Par Pharm.*, 2018 U.S. Dist. LEXIS 43612, at *18 ("A party asserting a claim under the DTSA and the NJTSA must show: (1) the existence of a trade secret and (2) the misappropriation of that secret").

New Jersey courts consider several factors in evaluating whether information constitutes a trade secret: (1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of

---

[3] The DTSA broadly defines "trade secrets" as "all forms and types of financial, business, scientific, technical, economic, or engineering information" if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). The DTSA defines misappropriation" as "acquisition of a trade secret… by improper means; or disclosure or use of a trade secret of another without express or implied consent…." *Id.* at § 1839(5). The DTSA further defines the term "improper means" to include theft, misrepresentation, "breach or inducement of a breach of a duty to maintain secrecy." *Id.* at § 1839(6).

the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information can be acquired or duplicated legitimately by others.  *Cooper Hosp./Univ. Med. Ctr. v. Sullivan*, 183 F.R.D. 119, 126 n.5 (D.N.J. 1998) (citing *Smith v. BIC Corp.*, 869 F.2d 194, 199 (3d Cir. 1989)).  Logically, misappropriating a trade secret requires something secret.

Plescia and Rubinetti may also have been independently bound by the Agreements not to disclose Plaintiffs' "Confidential Information."  But whatever the source of Plescia and Rubinetti's duty not to disclose Plaintiffs' Confidential Information, two issues arise.  First, "Confidential Information" is defined so broadly by the Agreements that it is difficult to discern precisely which category Plaintiffs allege the client pitches and Excel Templates to fall within.  *See* D.E. 1 at 350-51, ¶ 2(a).  But more significantly, "Confidential Information" explicitly *excludes* material that is publicly available, already in the recipient's lawful possession or known to the recipient, or independently developed by the recipient.  *Id.* at 350, ¶ 2(b).  Thus, even assuming some statutory (the Defend Trade Secrets Act), contractual (the Agreements), or other duty that Plescia or Rubinetti violated, the claims hinge on a key factual determination: whether the Confidential Information is actually confidential, under the Agreements or otherwise.

Courts considering whether information was misappropriated must determine whether the information was provided by the employer to the employee "for the sole purpose of furthering [the employer's] business interests."  *Thomas & Betts Corp. v. Richards Mfg. Co.*, 342 F. App'x 754, 759 (3d Cir. 2009) (citing *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 299 (2001)).  To answer that question, the Court should consider: (1) whether the information was generally available to the public; (2) whether the employee would have been aware of the information if not for their

7

employment; (3) whether the information gave the employee a competitive advantage vis-à-vis the employer; and (4) whether the employee knew that the employer had an interest in protecting the information to preserve its own competitive advantage. *Id.*

Plaintiff avers that the Excel templates were created not by Plaintiffs, but by Lehr Construction Co Inc., "another sizeable and sophisticated New York City-based general contractor…as long ago as 1999," before Plaintiffs existed. Plescia Decl. ¶ 37. According to Plescia, Lehr CEO Jeff Lazar knew of the Excel Templates' widespread circulation but never considered them proprietary. *Id.* ¶¶40-41. Likewise, Elysium's current Director of Estimating, previously a JRM NJ estimator and one of the employees allegedly solicited by Plescia, avers that JRM NJ's supposedly proprietary estimating methodologies are "nearly identical" to those she had previously developed elsewhere. D.E. 16-1 ("Latour Decl.") ¶¶ 6-8.

Moreover, Plaintiffs, according to Plescia, provided prospective clients with budget estimates generated using the Excel Templates without any understanding or agreement suggesting that they were confidential. Latour Decl. ¶ 30; Plescia Decl. ¶ 42. According to Defendants, these Templates were sometimes sent in their native Excel file format instead of PDF, permitting recipients "unfettered access to the entirety of the template's contents, including all underling formulas and calculations[.]"[4]   Latour Decl. ¶ 31. And often, estimates were shared with competitors. Latour Decl. ¶ 30; Plescia Decl. ¶ 42; McWilliams Decl. ¶ 16.

Plescia frequently "transmitted [pitch presentations] to prospective clients via online file sharing platforms, such as Google Drive, or, alternatively, external storage media, such as USB thumb drives. Plescia Decl. ¶ 35. But Plaintiffs mention no measures to ensure confidentiality.

---

[4] This is vigorously disputed by Plaintiffs, who argue that embedded formulas were always removed. Reply 8 (citing O'Doherty Decl. ¶¶ 9-14).

8

Rather, it was their "experience…that customers and prospective customers do not distribute these…presentations to our competitors." McWilliams Decl. ¶ 14. According to Defendants, however, the presentations "were provided to JRM NJ's clients without any expectation or agreement as to their confidentiality. Indeed, prospective clients…frequently, if not always, forwarded JRM NJ's proposals and presentations to other contractors to leverage pressure on the bidders to lower their bids[.]" Plescia Decl. ¶ 36.

Plaintiffs challenge much of this in reply, but this merely highlights the factual disputes. The substantial disputes about whether the Confidential Information was ever meant to be confidential and/or whether Plescia and Rubinetti ever had any reason to suspect the documents were confidential are material. And because they are material, they must be resolved through discovery, not on a motion seeking preliminary injunctive relief.

### 2. *The second issue of fact: whether Plescia or Rubinetti shared or misappropriated the Confidential Information*

There is likewise a fundamental dispute about whether Plescia or Rubinetti shared or misappropriated any Confidential Information. Plaintiffs allege that Plescia, at the end of his employment, used Plaintiffs' computer to save "massive amounts of Plaintiffs' files and folders…to use…at Elysium[.]" Karchmer Decl. ¶¶ 17, 20-21. Plescia does not deny that any of this occurred. However, he explains that his responsibilities required him to work extra hours, which he often did remotely, necessitating remote access to the files in question. Plescia Decl. ¶¶ 11-15. As to why he did so at the end of his employment, he explains that he sought to preserve the files for Plaintiffs because he expected his laptop to be erased and re-issued to another employee. *Id.* ¶¶ 21-25. Plescia "wish[es] to be clear" that "Elysium has not possessed, and does not possess, and does not use, any of Plaintiffs' confidential or proprietary information, or trade secrets." *Id.* ¶ 44.

Plaintiffs also allege that Rubinetti took an afternoon off while working for Plaintiffs, traveled to Elysium's office, and used her JRM computer to access Plaintiffs' Confidential Information and transfer it to Elysium. Compl. ¶¶ 15, 120-22; Karchmer Decl. ¶¶ 10-11. Defendants suggest a less nefarious explanation: Rubinetti took time off to interview with Elysium during her personal time. Rubinetti Decl. ¶ 16. When informed that her interviewer was late, she asked for space to work and, as she frequently utilized elsewhere, an external display to examine construction plans and drawings. *Id.* ¶¶ 17-18. Plaintiff used a USB cable, which Plaintiffs insinuate that Rubinetti used to transfer information, was used to connect a "small older model television" as an external display. *Id.* ¶ 19.

Rubinetti states that she did not "permit anyone at Elysium to access, use, or view the contents of [her] laptop, including the documents that [she] had accessed while working" remotely that day. *Id.* ¶ 24. She also denies "transfer[ring] any JRM NJ files or folders from her laptop or the company's systems to any other device." *Id.* ¶ 25. This, of course, conflicts directly with Plaintiffs' argument that Rubinetti's computer was "connected to a wormhole switch device, which is solely used to transfer data." Reply 16 (quoting Karchmer Reply Decl. ¶¶ 4-9). And with Plaintiffs' reply that Rubinetti "accessed documents for JRM projects that she was never assigned to, had already been completed, or had not even started." Reply 16 (citing Romano Decl. ¶ 10). But given that this is disputed together with nearly every other issue of fact, it is more properly reserved for a robust discovery and litigation process, not a preliminary injunction hearing.

### 3. *The third issue of fact: whether Plescia solicited Plaintiffs' employees, clients, or vendors.*

Finally, Plaintiffs claim that Plescia improperly diverted Plaintiffs' business opportunities, disclosed confidential client information, *e.g.*, information for vendor Antonio Maiuolo Architect PLLC ("AMA"), or poached Plaintiffs' employees. Plescia explicitly denies any wrongdoing in

10

his own declaration and those of numerous employees who left Plaintiffs to work for Elysium. A common argument emerges from the employees' submissions: Plescia did not solicit them to work at Elysium. Instead, the employees, unhappy working for Plaintiffs, reached out to Plescia or other Elysium employees to inquire about working at Elysium. *See, e.g.* D.E. 16-1 (Latour) ¶¶ 9-15; 16-2 (Rubinetti) ¶ 15; 16-3 (Chomiak) ¶¶ 8-9; 16-4 (Durante Decl.) ¶¶ 10-15; 16-5 (Savino) ¶¶ 6-12.

Plescia likewise denies any untoward conduct with respect to Plaintiffs' vendors or clients. Plescia Decl. ¶ 27. In the case of Sionis Architecture, Plescia explains that Sionis was not a JRM NJ client, and in any event that he referred them to Elysium because JRM NJ "could not perform the project for which Sionis Architecture was soliciting bids." *Id.* ¶ 30. Similarly, Plescia explains that Greenway Properties, the only client identified by Plaintiffs as having been poached, chose Elysium because it was a non-union (and therefore cheaper) shop. Plescia Decl. ¶ 31.

Plaintiffs' reply attaches declarations which dispute all of these contentions, which serves only to highlight the disputes. Whatever the credibility of the parties' respective arguments, that is not for the Court to determine at this juncture. Accordingly, preliminary injunctive relief is inappropriate at this time.

### B. Immediate Irreparable Harm

The movant has the burden of proving a "clear showing of immediate irreparable injury" absent injunctive relief. *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). Irreparable harm cannot be presumed, and "must be established as a separate element, independent of any showing of likelihood of success." *King Pharm. Inc. v. Sandoz, Inc.*, Civ. No. 08-5974, 2010 U.S. Dist. LEXIS 48385, at *5 (D.N.J. May 17, 2010) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 21-22 (2008)).

Here, Plaintiffs argue that they will suffer irreparable harm if Defendants are permitted to continue to use and disclose the confidential and trade secret information they unlawfully acquired. Plaintiffs argue that the misappropriated information grants Defendants a "significant and unwarranted competitive head start without having to incur the" related costs, causing Plaintiffs to suffer irreparable harm to their "market position, reputation, and goodwill" and "a sharp likelihood that Plaintiffs' customers will transfer their business and projects to Elysium (as one already has), who will be able to undercut Plaintiffs' pricing and utilize the trade secret information for competitive business advantage." *See* D.E. 4 at 27.

As an initial matter, irreparable harm arguments like those advanced by Plaintiffs are undermined by delay in seeking injunctive relief. *Vita-Pure, Inc. v. Bhatia*, 2015 U.S. Dist. LEXIS 42655, at *4 (several months of delay before bringing a motion for a preliminary injunction "can undermine an asserted claim of imminent, irreparable harm." *Id.* (citing *PTT, LLC v. Gininie Games.*, No. 13-7161, 2014 U.S. Dist. LEXIS 148981, at *3 (D.N.J. Oct. 20, 2014) (no irreparable harm when plaintiff waited two months before filing suit and eleven months before seeking injunctive relief)); *Ultimate Trading corp. v. Daus*, No. 07-4203, 2007 U.S. Dist. LEXIS 76225, at *3 (D.N.J. Oct. 15, 2017) (no irreparable harm when plaintiff waited three months before filing suit and five months before seeking injunctive relief)); *Stryker Corp. v. Hagag*, No. 21-12499, 2022 U.S. Dist. LEXIS 139226, at *58 (D.N.J. June 30, 2022) (no irreparable harm where plaintiff waited five months after filing complaint to seek injunctive relief).

Here, viewed in proper context, Plaintiffs' delay was not unreasonable. JRM's President sent Plescia a cease-and-desist letter dated August 29, 2022, asserting Plaintiffs' belief that Plescia had breached the Agreements by soliciting and hiring various JRM employees and threatening an action seeking damages and injunctive relief. Plescia Decl. ¶ 45; DE 16-6 at 15. Plaintiffs' counsel

did not send a follow-up demand until November 8, 2022, this time also adding the allegation of Plescia's alleged use of Plaintiffs' trade secrets and confidential information. Plescia Decl. ¶ 47; DE 1 at 345. That letter again threatened legal proceedings. *Id.*

Defendants responded on December 19, 2022 by asserting Plescia's "full compliance…with any and all restrictive covenants." D.E. 16-7 at 4. Plaintiffs responded on January 11, 2023, rejecting the response and again threatening imminent litigation. But despite the many threats of imminent litigation, it was not until February 17, 2023, over five months after the initial August 29, 2022 letter, that Plaintiffs filed this action.

In other words, the five-month period between the initial, August 29, 2022 cease-and-desist letter and the filing of this action can be explained as settlement negotiations, as memorialized in a Consent Permanent Injunction and Arbitration Award sent by Plaintiffs' counsel to Defendants' counsel on December 2, 2022. *See Times Mirror Magazines Inc. v. Las Vegas Sports News*, 212 F.3d 157, 169 (3d Cir. 2000) (15-month delay not unreasonable where it was attributable to negotiations); *Spark Therapeutics, Inc. v. Bluebird Bio, Inc.*, Civil Action No. 21-00705, 2022 U.S. Dist. LEXIS 13133, at *54 (D. Del. Jan. 25, 2022) (three months is "not an unreasonably long period in which to prepare a preliminary injunction motion together with a detailed brief, exhibits, and an expert report" where parties were also seeking an informal resolution of the dispute during that period). Accordingly, Plaintiffs' delay alone does not demonstrate a lack of immediate irreparable harm.

Turning to the substance of the harm, misappropriation of trade secrets can cause irreparable harm because the loss of trade secrets cannot be measured in money damages, and a trade secret once lost is lost forever. *Par Pharm.,* 2018 U.S. Dist. LEXIS 43612, at *18 ("New Jersey applies a presumption of irreparable harm in trade secret cases"); *Ace Am. Ins. v. Wachovia*

13

*Ins. Agency, Inc.*, 2008 U.S. Dist. LEXIS 83076, at *25 (D.N.J. Oct. 17, 2008) ("Disclosure of confidential information or trade secrets may also constitute irreparable harm."); *Score Board, Inc. v. Upper Deck,* 959 F. Supp. 234, 240 (D.N.J. 1997); *Trico Equip., Inc. v. Manor,* 2009 U.S. Dist. LEXIS 50524, at *23 (D.N.J. June 13, 2009) (employer will suffer serious irreparable injury because employee and his new employer "benefit from the confidential information he learned working for [former employer]").

Plaintiffs also argue that solicitation of customers and employees can constitute irreparable harm. *See HR Staffing Consultants, LLC*, 2015 U.S. Dist. LEXIS 71220, at *41 ("[t]he loss of these business opportunities would irreparably harm [plaintiffs]"); *Mister Softee, Inc. v. Amanollahi*, 2014 U.S. Dist. LEXIS 90370, at *43 (D.N.J. July 1, 2014) ("[The Third Circuit] has recognized that [g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will") (citations and internal quotations omitted); *Menasha Packaging Co., LLC v. Pratt Indus.*, 2017 U.S. Dist. LEXIS 22318, at *24 (D.N.J. Feb. 15, 2017) (quoting *Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d 727, 766 (D.N.J. 1998) ("Generally, the loss of good will, the disclosure of confidential and proprietary information, and the interference with customer relationships may be the basis for a finding of irreparable harm.").

However, for the reasons above, any determination of irreparable harm requires resolution of numerous material issues of fact. Accordingly, Plaintiffs have also failed to satisfy this requirement for injunctive relief.

### C. Expedited discovery

Plaintiffs seek to shorten the time in which they can (i) depose Plescia, Rubinetti, Elysium (in accordance with Fed. R. Civ. P. 30(b)(6)), Michael Durante, Elizabeth Latour, and Matthew Sheehan (ii) Plaintiffs to propound 15 document requests and 10 interrogatories on each

Defendant; and (iii) obtain electronic discovery from Defendants, including evidence of Defendants' illegal misappropriation of Plaintiffs' Confidential Information and any electronic mail sent to Plaintiffs' employees and customers.

Fed. R. Civ. P. 26(d)(1) empowers the Court to order discovery to begin prior to the parties conferring as required by Fed. R. Civ. P. 26(f) in cases "such as those involving requests for a preliminary injunction," *i.e.,* before the normal inception of discovery. Fed. R. Civ. P. 26(d)(1), Advisory Committee Note (1993). The party seeking expedited discovery must demonstrate

> (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.

*Gucci Am., Inc. v. Daffy's, Inc.*, Civil Action No. 00-4463, 2000 U.S. Dist. LEXIS 16714, at *15-16 (D.N.J. Nov. 14, 2000).

Plaintiffs are correct that courts have ordered expedited discovery in cases, like the one here, involving a former employer's request for injunctive relief based on its former employee's violation of postemployment restrictive covenants and/or disclosure of confidential information and trade secrets. *See, e.g.*, *Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 208 (D.N.J. 2009) (permitting expedited discovery after entry of temporary restraining order and prior to preliminary injunction hearing where plaintiff sought enforcement of a restrictive covenant); *Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 471 n.2 (E.D. Pa. 2007) (granting motion for a preliminary injunction in a case involving a restrictive covenant, and noting the entry of order setting an expedited discovery schedule prior to the injunction hearing).

In those cases, however, the emergent applications had justified granting a temporary restraining order, suggesting "some probability of success on the merits" and satisfaction of the other expedited discovery factors. For the reasons above, however, that is not the case here.

Moreover, Plaintiffs have made an insufficient showing that any losses cannot be remedied by monetary damages after a more robust discovery process. Accordingly, the Court will also deny expedited discovery.

## IV. CONCLUSION

For the reasons above, Plaintiffs' motion for a temporary restraining order, preliminary injunction, and expedited discovery are **DENIED**. An appropriate order accompanies this Opinion.

Dated: April 4, 2023

Evelyn Padin, U.S.D.J.